Natalie K. HALEPESKA et al., Petitioners,

v.

CALLIHAN INTERESTS, INC., Respondent.

No. A–8698.

Supreme Court of Texas.

July 31, 1963.

Rehearing Denied Oct. 9, 1963.

Childers & Garrett, Abilene, Hill, Brown, Kronzer & Abraham, Houston, for petitioners.

McMahon, Smart, Sprain, Wilson & Camp, Abilene, Leachman, Gardere, Akin & Porter, Dallas, J. M. Lee, Abilene, with McMahon, Smart, Sprain, Wilson & Camp, Abilene, for respondent.

GREENHILL, Justice.

Natalie Halepeska and her children brought this action for the wrongful death of Dennis L. Halepeska, their husband and father, respectively. The defendant is Callihan Interests, Inc., hereafter called Callihan. Halepeska and a Mr. D. F. Morris were killed when a gas well owned by Callihan blew out. Trial was to a jury.

Disregarding the answers by the jury to some issues, the trial court entered judgment against Callihan for $85,000. The Court of Civil Appeals at Eastland reversed that judgment and rendered judgment for Callihan. 349 S.W.2d 758. The basis of the Court of Civil Appeals' opinion, upon certain jury findings, was that Callihan had breached no duty toward Halepeska because the danger was open and obvious, and that Halepeska had voluntarily exposed himself to a risk of which in the exercise of ordinary care, he should have known and which he should have appreciated. The jury also found that Halepeska did not have full knowledge of the manner in which the well was equipped and did not appreciate the extent of the danger in opening the valves on the well. The Court of Civil Appeals did not regard these findings as controlling.

The case involves the difficult and sometimes overlapping questions of "no duty" to invitees, the doctrine of *volenti non fit injuria,* or voluntary exposure to risk, as well as negligence and contributory negligence.

Because there were no eyewitnesses to the accident and because circumstantial evidence becomes important, a rather full description of the facts is necessary. The transcribed testimony fills three thick volumes, and there are numerous exhibits and pictures. It is difficult to reduce this material to the usually desired brief statement of facts.

The Callihan oil properties had been privately owned. When Mr. Callihan died in 1952, he left them to his widow. She became Mrs. Farnsworth. The business was incorporated as Callihan Interests, Inc., in 1958, with Mrs. Farnsworth owning all, or virtually all, of the stock.

In the statement of the facts which follows, it is important to follow the activities not only of Halepeska but of Morris. Morris was an "old time" oil man, a jack of all trades. He was named secretary of Callihan, Inc., upon its incorporation, but he continued his same work for that company. Morris was a landman for Callihan with some thirty or forty years' experience in the oil fields. While it was not in Morris's particular department to bleed or blow the well in question, there were no restrictions on his activities. The clear inference is that he could have done so.

Halepeska first went to work as an employee of Callihan (Mrs. Farnsworth) in 1954 as a geologist. He was regarded as a good one. There was a reorganization in 1958 and the business was incorporated. In the charter, Halepeska was named or listed as vice president, though his duties remained the same. The corporation also had another geologist named Vaughn. Following the reorganization, Halepeska and Vaughn severed their official working relations with the corporation though they continued to do a great deal of work for Callihan. Halepeska continued to be a vice president of Callihan, though he received no salary as such. They were no longer carried as employees of Callihan on its books. They kept separate records. They were no longer listed by Callihan for income tax, social security, or insurance purposes. They established what they called an independent geological consulting firm known as "Halepeska and Vaughn." There was evidence that they had a separate office, with their names on the door, a separate telephone listing, and separate secretarial service. While they were paid a substantial retainer by Callihan, they held themselves out as independent geologists, a fact recognized from the stand by Mrs. Farnsworth. Halepeska and Vaughn had purchased from Callihan the cars and furniture they had been using. Payments thereon were deducted monthly from their retainer. At the time of Halepeska's death, he and Vaughn shared their profits on a 50–50 basis. In short, there is evidence to support the jury's findings that Halepeska had become an independent geologist and was a business invitee upon Callihan's property at the time of the fatal occurrence in question. Commercial Stand-

ard Ins. Co. v. Davis, 134 Tex. 487, 137 S.W.2d 1 (1940).

Callihan owned mainly oil properties. It had only three or four gas wells. The particular well here involved was on the Smith lease in Callahan County. The well was drilled for Callihan in 1955 by Worth Thomason of Brownwood. Halepeska was then an employed geologist of Callihan. He had been present during the drilling and at the completion of the well. It was perforated at approximately 3570 feet in the Duffer Lime. It was hoped that the well would be an oil well and that sand fracting would make it so. But it did not, and the well was regarded as a gas well. As Halepeska knew, it had a bottomhole pressure of 1280 pounds per square inch. It was never completed as a gas well. Halepeska had made the drill stem test. He had wanted to "set pipe" at that time, but this was not done. No tubing was placed in the hole, and only surface casing was set. It was shut in as a gas well in 1955; and no further efforts were made to cause it to produce until 1958.

In November of 1958, Callihan re-entered the well. While Mr. Fuller was superintendent, Mr. Howell was in charge under Fuller. Mr. Nicholson made a dead-weight test, Fuller supervised the perforation, and Howell acidized the well. Halepeska was not present at these operations.

On December 9, 1958, O. J. Russell of Riley Maxwell Company, an oil field servicing company, was employed by Callihan to work on the well. The well had a 4-inch pipe within the surface casing. It had a 4-inch master gate valve on it. Accompanied by Callihan employees Nicholson and Morris (who was killed later with Halepeska), Russell went to the gas well. Above the 4-inch valve, there was placed a 2-inch choke which had a maximum opening of ¾ inch. The 4-inch valve was first opened. Then the 2-inch choke was opened ¼ inch so as to let the gas escape, and later opened to ½ inch. At the time Russell "blew" the well, it was not equipped with the 2-inch

valve, the "L" joint, or flow line, as it was equipped when Halepeska and Morris were killed. The gas was produced through the choke, which was considered to be a safety factor. The gas was allowed to escape directly from the vertical well structure through the choke. The well was thus tested without incident for approximately eight hours.

Russell said that the equipment on the well was [then] good, and no changes were necessary. He found that the well was making a little fresh water, and he felt that the "open flow would go considerably higher if the water was gotten out of the formation." He told the Callihan people that the well would make a higher test if they got the water out of it, but he did not advise them how to get the water out.

Morris was present when Russell "blew" the well. Halepeska was not present. Nicholson testified that Morris observed Russell opening the choke. While Morris did not stay for all of the test, Russell did tell Morris that the well should be "blowed" so as to get rid of the water. Russell testified that to get rid of the water, it was necessary to blow a well hard enough to raise the fluid; that to get the water out, you have to blow it pretty hard.

L. R. Fuller, production superintendent for Callihan, testified that on December 15 (before the fatal accident on the 17th) Morris had said the well ought to be flowed (or blown), a view shared by Halepeska. Both Morris and Halepeska had expressed unusual interest in the well and believed it to be a productive one.

Clark Howell, field superintendent for Callihan directly under Fuller, testified that Fuller told him to go to the well on December 15 and fix it up so it could be flowed. Howell testified that Morris told him how it should be fixed: it should have a pipe leading to the slush pits to take care of the oil and water which would be produced. Howell also testified that on the morning of December 15 he had a conversation with Halepeska as to how the well was to be

equipped. He said Halepeska told him to "fix it up to the pit, where we could flow it without any danger to the farm property . . . or any cars that might be passing by."

On the morning of Monday, December 15, 1958, Howell went with Emmett Price, a Callihan pumper, to the well to equip it for the blowing. He and Price took off the 2-inch choke which had been used by Russell to blow the well on December 9. In its place they put some other equipment including a 2-inch valve, an "L" joint sticking out horizontally to the side of the well in a southerly direction, and 2 joints of pipe 20 feet long and 2 inches in diameter. The 40 feet of pipe led in an easterly direction from the "L" joint just off the well to a slush pit to the east and a little bit south of the well. Near the end of the 40 feet of pipe (called the "flow pipe") there was a single set of stakes to hold the flow pipe down. The testimony as to the distance the pipe extended beyond the stakes varied from 18 inches to 4 feet. The stakes consisted of two odd pieces of pipe (a 1½" steel pipe and ¾" rod), driven into the ground and crossed above the flow pipe. The two pieces were secured by a rope. Thus braced by the single set of stakes, the flow pipe led from the well to the slush pit at ground level.

Apparently the reason the choke was taken off the well and replaced with the 2-inch valve was explained in Callihan superintendent Fuller's testimony. Fuller said that the ¾-inch choke would not get the water out of the well; "you couldn't get enough gas through it to bring the water out"; it was necessary to put the 2-inch valve on it to accomplish the purpose.

As stated, the well had not been completed in the usual sense of the word. It had a "T-head" or "Christmas tree" which had been screwed onto the wellhead. From this "T-head" the "L" of pipe extended; and from that, the 40 feet of flow line extended to a slush pit to the east of the well. There were other slush pits to the east and south of the well. On top of the "T-head" was a valve which would register the gas pressure.

While Halepeska had been present when the well was drilled in 1955, except for one visit with Fuller when there was no activity, there was no direct evidence that Halepeska had been at this particular well thereafter until shortly before he was killed there on December 17, 1958. Callihan's witness Leonard testified that he had not seen Halepeska at the well after it was equipped with the 40-foot flow line. Fuller, the production superintendent, testified that Halepeska had nothing to do with the production or equipment of wells. His duties as a geologist were mainly to make drilling recommendations based on seismographic information, maps, cores, and electric logs. He advised Callihan on the purchase and sale of leaseholds. He as well as Morris was authorized to go on Callihan properties. But he had been around wells enough to be generally familiar with their operation. The witness Bedford testified that Halepeska was definitely a leader.

After thus rigging the well for blowing, Howell and Price on December 15 thereupon "flowed" or "blowed" the well with the same equipment it had on December 17 when Halepeska and Morris were killed. The operation on December 15 lasted between 40 minutes and an hour. The well then had 1400 pounds of pressure at the beginning and was bled down to 500 or 600 pounds. It produced a little moisture through the flow pipe, perhaps a barrel.

When Howell and Price bled the gas well on December 15, they first saw that both the lower 4-inch valve and the 2-inch valve were closed. Then they opened the 4-inch valve. Then they just cracked the 2-inch valve and opened it very gradually. One of the two men was close to the 2-inch valve at all times. When the pressure declined, the 2-inch valve would be opened a little more.

The well had been equipped with a 2-inch choke when Russell bled the well on December 9. The choke was calibrated to ⅟₆₄th of an inch so that the operator could tell at all times how large the opening was. It had an maximum opening of ¾ inch. When Howell and Price bled the well, the choke was removed, and a 2-inch valve was installed. It had a maximum opening of 2 inches. It had no calibration and opened like a water faucet. It could be opened gradually, and hence could be used like a choke. But there was no way to tell how much it had been opened. The operator had to operate by the "feel" of the valve.

Price testified that when the well was being blown "pretty heavy" the flow pipe began to shake. He would not say it flopped; it just vibrated. "You could tell from its shaking things a little bit when to close it [the valve] down if you watch it." If you opened the valve "pretty good," the flow line began to shake.

Price testified that Howell had told him that he wanted him, Price, to blow the well every two or three days after the well was blown on December 15, and he would have done so but for the accident.

As stated, the T-head or Christmas tree was screwed onto the production pipe. It therefore could be screwed off, and it was screwed off by the force of the gas when Halepeska was killed. Fuller, Callihan's superintendent, said this particular well was "a temporary hookup." When completed, the equipment would be welded. There was equipment with flanges (bolts) which would not unscrew. There was testimony that flange equipment was not needed or used in the vicinity; but plaintiff's witness, Gruy, said that flange equipment should have been used.

Howell testified that on December 16th, the day following the blowing of the well by Howell and Price, there was a conversation about the flowing of the well. Present were Howell, Fuller, one Bedford, Morris and Halepeska. Howell said he told Halepeska how and the manner in which the well had been flowed, and what the pressure and volume of the gas were at the time. He said that Halepeska had objected to the manner in which it had been flowed; that Halepeska had said the well "needed to be blowed down harder"; that it had not been blown hard enough or it would have more pressure and more volume of gas.

Bedford, who was present at the conversation, testified that Howell did not tell Morris and Halepeska how the flow line began to shake, upon opening the 2-inch valve, to the point that it was necessary to close the valve down.

On the following day, December 17, when Halepeska and Morris were killed, they apparently left Abilene to negotiate for some leases near Comanche, Texas. Fuller, the superintendent, testified that they went out to the well to get a test, to blow it down; that Halepeska wanted to get a better test. They stopped at Cross Plains where they met Halepeska's friend, Bryant, around noon. Bryant, aged 73, had "sat on wells" with Halepeska. Halepeska and Morris asked Bryant to eat lunch with them and to go with them to the well in question. Bryant owned property near the Smith well, and he shared Halepeska's opinion that pipe should be set in the well.

Bryant said "they" were going down to the Smith lease to "open the gate" or "open a well"; i. e., to open the valves on the well. Bryant had to decline the invitation. Morris and Halepeska then departed for the well.

Shortly thereafter, Bryant drove to a Mr. Westerman's house, a half mile distant. He had walked to Westerman's house and had knocked on the door. Westerman came out, and the two were walking to their car when they heard the explosion at the well, a little less than two miles away. They arrived at the well some 10 or 12 minutes after hearing the explosion. From this testimony, counsel for Callihan draws the conclusion that the valves on the well were opened quickly and suddenly.

**374**

What Bryant, Westerman and others found at the well site, as well as the explanation as to what happened, may be more easily explained by the following diagrams prepared by us. The top diagram is roughly illustrative of the situation before the accident. The second is designed to show the first movement of the wellhead and flow pipe when the valves were opened. The lower diagram represents the situation afterward. The diagrams are not drawn to scale and are for illustrative purposes only. The location of the two-inch valve may or may not be accurately represented. Its location is not fixed with certainty in the record.

When Westerman and Bryant arrived, the bare pipe with its collar was sticking out of the ground spewing a dark brownish gas, like a fog. The collar had been stripped of its threads. The Christmas tree or T-head which weighed 150 to 200 pounds was off the well and was some 75 feet northeast therefrom. Westerman said Morris was seated, upright, some three or four feet west of the well. His false teeth were found near him. His clothes were intact except for a tear in the back around his shoulders. There was also blood near him. He was bleeding from the back of the head and from his back. The witness Nicholson said he found a small pool of blood some six to ten feet southwest of the well. Morris tried unsuccessfully to speak. He died without being able to relate what happened.

Halepeska was found dead several minutes later, face down on the far or south edge of a slush pit. Except for his shoes and underwear, his clothes had been blown off. They were strewn about the slush pit. His wrist watch was by his side. There was one fresh footprint in the pit, three or four feet from Halepeska, which Westerman thought was from Halepeska's left foot.

Also in the pit was the 2-inch valve from the wellhead. Attached to it was a short joint of pipe, called a nipple. The threads on the nipple were stripped. The two 20-foot pieces of pipe had separated and were northwest and west of the well, respectively, each some 50 to 75 feet from the well. The piece to the north of the well was twisted to an "S" shape. The gauge, which had been on top of the T-head, was some 50 feet northeast of the well with a nipple attached.

The 4-inch valve and the 2-inch valve, when found, were both wide open. The stakes which were to hold the flow pipe were still in place, undisturbed.

Witnesses for both parties appeared to agree as to what happened, though they did not agree as to the reasons. It was assumed that both valves had been opened rather quickly. The rush of the gas out of the "L" joint and out of the 40 feet of 2-inch pipe had created a terrific back pressure, kickback, or jet action back toward the well. The flow pipe and "L" joint were pushed back clockwise, tightening the T-head down on the pipe. This action pulled the flow pipe out from under the stakes. Once freed, the jet action caused the flow pipes to flop around like a water hose or balloon uncontrolled. The pipe then flew around in a reverse or counterclockwise direction and screwed the T-head off the well. When it was nearly unscrewed, the T-head blew off, and the parts of the well equipment were spread around violently. The men may have been killed by the fast moving equipment. The witness, Gruy, testified that the jet stream of gas under such pressure could kill a man.

The plaintiffs' witness, Gruy, a petroleum engineer, testified the T-head would not have unscrewed if there had been no "L" joint, if the flow lines had gone out directly from the well so that the back pressure would have been directly onto the T-head. The T-head would not have unscrewed if it had been secured with flanges or bolts; that the well should have been equipped with flanges. He said the well should have been equipped with a calibrated choke instead of an ordinary 2-inch valve. And had the flow line been properly staked, it could not have pulled out from under the stakes, thus bringing about the unscrewing action. He said that ordinarily a flow line should have at least three stakes per joint of pipe. He concluded, "Any one of these failures could have been fatal. The combination was certainly fatal."

On cross-examination, he conceded that he would not recommend opening both valves immediately and that the actual cause of the accident was the opening of the valves wide before the pressure had bled down enough to be safe. But he also said you could not properly bleed the well without blowing the well "pretty hard."

Callihan's witnesses said the well was adequately equipped; that the 2-inch valve could be used as a choke; that the well was staked in the usual manner; that flanges were not used in that vicinity for the pressures encountered there; and that the well could have been bled safely if the valves had been opened slowly. It had been so bled two days before by Howell and Price. Callihan's superintendent, Fuller, conceded that if the pipe kicked loose from the stakes it would unscrew the T-head. But he said you would never need more than one set of stakes unless you opened the valves too wide. Gruy agreed that it would not have been necessary to open the valves wide enough to cause this catastrophe. He would have opened the 2-inch valve slowly, using it as a choke. Callihan's witness, Russell, testified that oil field equipment under pressure is inherently dangerous, but that the well as equipped could have been blown safely. But he would not open the two valves quickly even if the flow line had been staked all up and down the line. Callihan's witness, Thomason, who had first drilled the well, testified that an experienced person could have blown the well without any stakes at all across the flow line.

It is noteworthy that Callihan's witnesses said that the situation which was presented to Halepeska and Morris was not that of an open and obvious danger. Worth Thomason and Frank Bridwell both so testified. Plaintiff's witness, Gruy, on the other hand, testified that a person walking out there could see that this was a dangerous situation; that the flow line was not staked every three feet; that anyone should know that 1350 pounds of pressure was dangerous; but that you could not see at a glance that the well was not equipped with a choke.

The case was submitted to the jury. It found:

1. Callihan did not fail to sufficiently screw the nipple of the 4-inch valve into the collar connected to the casing.

4, 5, and 6. Callihan failed to sufficiently stake down the flow pipe; this was negligence and a proximate cause of Halepeska's death.

7. Callihan rigged the equipment so as to direct the jet action of the gas through the flow line to the side of the well-head instead of directly into it; but this was not negligence.

10 and 11. The failure of Callihan to equip the well with a choke was negligence but not a proximate cause.

12 and 14. It was not negligent for Callihan to fail to put tubing in the well or to equip the well with flanged equipment.

16 and 17. Halepeska was a "business invitee" on the Smith lease. He was an independent geologist.

18. Before the valves on the well were opened, Halepeska did not have full knowledge of the manner in which the well was equipped.

19. Just before the valves were opened, Halepeska did not appreciate the extent of the danger in opening said valves.

Since the jury had answered Issues 18 and 19 as it did, it did not answer Issue 20 which inquired as to whether Halepeska voluntarily exposed himself to such known and appreciated danger.

20-A. Before the valves were opened, in the exercise of ordinary care, Halepeska should have had full knowledge of the manner in which the well was equipped.

20-B. In the exercise of ordinary care, Halepeska should have appreciated the extent of the danger, if any, in opening such valves.

20-C. Halepeska "voluntarily exposed himself to such danger, if any, which in the exercise of ordinary care he should have known and appreciated. . . ."

21. It was not an unavoidable accident.

The only other issues concerned the amount of damages.

Plaintiffs' counsel requested issues as to whether Morris opened the valves; whether he opened them too suddenly; and whether this was negligence and a proximate cause. Defendant's counsel requested similar issues as to whether Halepeska opened the valves, too quickly, and whether this was negligence and a proximate cause. The trial court declined to submit these issues, and the failure to submit them was preserved as error by both parties.

The trial court disregarded the answers to Issues 20–A, 20–B and 20–C, which found that Halepeska *should have known* of the manner in which the well was equipped; *should have appreciated* the extent of the danger in opening the valves; and voluntarily exposed himself to such danger, which in the exercise of ordinary care, he *should have known and appreciated.* After so doing, the trial court entered judgment for the plaintiffs, Mrs. Halepeska and her children.

The Court of Civil Appeals held that the trial court erred in disregarding those issues; and that the decision of this Court in McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954), required that the cause be reversed, and judgment was rendered for the defendant, Callihan.

It would be well at the outset to narrow the field under consideration here. In the "no duty" area, we are dealing with occupiers of premises, or persons considered in law to be in that class, and their invitees or business guests. We are not dealing with trespassers. Nor are we dealing with licensees, though some of the principles may be applicable to them. The invitee is generally on the premises with the consent of the occupier and not by contractual right. So we are not dealing with the duties of a landlord to his tenants. It was held in Harvey v. Seale, Tex., 362 S.W.2d 310 (1962), that the "no duty" concept here discussed was not a limitation on the duty of the landlord to his tenant. Similarly it was held that the "no duty" concept was not applicable in a master-servant relationship. Sears, Roebuck & Co. v. Robinson, 154 Tex. 336, 280 S.W.2d 238 (1955). It has also been held that the defense of "assumed risk" applies only in the master-servant relationship. Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W. 2d 172 (1951); Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607 (1952). The defense of "assumed risk" has been removed by statute in workmen's compensation cases. Article 8306, Section 1(3). But the similar doctrine of voluntary exposure to risk, *volenti non fit injuria*, discussed below, is applicable to relationships other than master and servant. Wood v. Kane Boiler Works, cited just above.

The problems of obvious dangers, assumed risk, and voluntary exposure have received treatment in Texas which is different from that in many jurisdictions. The labels given to the particular concepts as they have been applied are largely unique to Texas. This is illustrated by the cases set out above. For this reason, texts and authorities from other jurisdictions are of but limited applicability.[1]

As stated by this Court in McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954), it would be simpler and perhaps preferable to treat these matters under ordinary negligence and contributory negligence; and many Texas cases have been decided on that basis.[2]

1. Keeton, "Personal Injuries Resulting from Open and Obvious Dangers" (1952), 100 Pennsylvania Law Review 629; a Symposium on Assumed Risk, Volume 22 of the Louisiana Law Review (1961), and particularly therein, "Assumption of Risk and the Landowner" by Keeton at p. 108; "Assumed Risk as a Defense" by Leon Green at p. 77; and "Informed Choice in the Law of Torts" by Mansfield at p. 17; Harper and James on Torts, 1162 et seq.; 2 Restatement of Torts § 343; and 4 Restatement of Torts § 893.

2. Gulf, C. & S. F. Ry. Co. v. Gascamp, 69 Tex. 545, 7 S.W. 227 (1888); J. Weingarten, Inc. v. Brockman, 134 Tex. 451, 135 S.W.2d 698 (1940); McAfee v.

This view is urged by many able scholars and text writers.[3] But this choice was afforded this Court in McKee and rejected because of *stare decisis*; that is, that the concepts of "no duty" and voluntary exposure to risk had theretofore become established in this State.

The "no duty" doctrine is this: the occupier of land or premises is required to keep his land or premises in a reasonably safe condition for his invitees. This includes a duty of the occupier to inspect and to discover dangerous conditions. Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853 (1950); Genell, Inc. v. Flynn, Tex., 358 S.W.2d 543 (1962). His duty is to protect his invitees from dangers of which he, the occupier, knows, or (because of his duty to inspect) of which he *should* know in the exercise of ordinary care. If there are dangers which are not open and obvious, he is under a *duty* to take such precautions as a reasonably prudent person would take to protect his invitees therefrom or to warn them thereof. But if there are open and obvious dangers of which the invitees know, or of which they are charged with knowledge, then the occupier owes them "no duty" to warn or to protect the invitees. This is so, the cases say, because there is "no duty" to warn a person of things he already knows, or of dangerous conditions or activities which are

so open and obvious that as a matter of law he will be charged with knowledge and appreciation thereof. This Court said in Harvey v. Seale, 362 S.W.2d 310 (1962):

"And there is no duty whatsoever with respect to conditions that are so open and obvious, with dangers therein so apparent, that the same are or should be known and appreciated by the visitor. One who has no right to enter except by virtue of the landowner's consent can remain off the premises if he does not wish to subject himself to the risk of injury from such conditions. Where he has an opportunity to exercise an *intelligent choice* as to whether the advantage to be gained by his entry is sufficient to justify his incurring the risk, the landowner owes him no further duty to protect him from harm." [Emphasis throughout is here added.] 362 S.W.2d at 312–313.

So in a suit by an invitee against the occupier, the invitee must not only prove that he was injured as a proximate result of encountering a condition on the premises involving an unreasonable risk of harm, but he must also prove, as part of the plaintiff's case, that the occupier owed him a *duty* to take reasonable precautions to warn him or protect him from such danger, i. e., the plaintiff must negative "no duty." This is the "no duty" referred to in the

Travis Gas Corp., 137 Tex. 314, 153 S.W. 2d 442 (1941); Walgreen-Texas Co. v. Shivers, 137 Tex. 493, 154 S.W.2d 625 (1941); United Gas Corp. v. Crawford, 141 Tex. 332, 172 S.W.2d 297 (1943); Blanks v. Southland Hotel, 149 Tex. 139, 229 S.W.2d 357 (1950); Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953).

3. In preparing Restatement of the Law of Torts, Second, the advisers sharply divided. A group mainly of distinguished deans and professors, favored striking the entire chapter of Assumption of Risk. They would use contributory negligence. The group includes Deans Page Keeton and Wade, and Professors James, Malone, Morris, Seavey and Thurman. Mr. Eldredge prepared a "dissent" for

this group. The group is referred to in the notes to the draft as "The Confederacy." Others including Prosser, Professor Robert Keeton, and Judges Fee, Flood, Traynor and Goodrich supported the existence of the defense of assumed risk. The distinguished scholars refer to the debate, among themselves, as "The Battle of the Wilderness." The Reporter, Prosser, states in the draft that the American Law Institute Council voted unanimously to follow the recommendations of the sections on assumption of the risk. Page 71, American Law Institute, Restatement of the Law of Torts, Second, Tentative Draft No. 9, April, 1963. Many of the principles announced herein are in accordance with those of the proposed restatement of torts.

cases. Academically, it may be a rather clumsy concept, but it is still the law. Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374 (1948).

■ The *volenti* doctrine is an affirmative defense. "Volenti" is a contraction of the Latin phrase, *volenti non fit injuria,* which means legally that a plaintiff may not recover for an injury to which he assents; that a person may not recover for an injury received when he voluntarily exposes himself to a known and appreciated danger. In this state, the decision to incur the risk must have been deliberate; i. e., made with knowledge and appreciation of the danger so that it may be said that the person acted as a result of an intelligent choice. Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951). Logically, a plaintiff cannot make an intelligent choice to confront a risk if he does not actually know of the danger, or know such facts as would in law charge him with knowledge of the danger and appreciation thereof. Thus, while the cases speak of the requirement of *actual* knowledge and appreciation, the plaintiff may not close his eyes to obvious dangers; and he may not recover where it is shown that he is in possession of facts from which he would be legally charged with appreciation of the danger. Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607 (1952).

Similarly, in both the "no duty" and *volenti* situations, whether he actually knows and appreciates the danger may be for the jury to pass upon, despite his testimony that he did not. His credibility may be for the jury. Moreover, the jury may be called upon to find whether he had knowledge of particular facts from which he would be charged with knowledge or appreciation of the danger. Or, in a proper case, the court may hold as a matter of law that the plaintiff had knowledge or that he is charged with knowledge and appreciation of the danger.

■ A basic difference between contributory negligence on the one hand, and "no duty" and *volenti* on the other, is the question of justification. Whether the plaintiff's conduct was justified may be an evidentiary consideration in deciding that a person of ordinary prudence should, or should not have so acted, but it is not a separate ultimate inquiry or issue. The question of plaintiff's justification is not ordinarily involved in the "no duty" concept. A person may voluntarily expose himself to a known risk and *not* be contributorily negligent, depending upon why he exposed himself; i. e., his conduct may have been that of a ordinary prudent person under the circumstances. For example, a mother going into a burning building to save her child, or a person crossing a defective bridge when it is the only way of travel. Gulf, C. & S. F. Ry. Co. v. Gascamp, 69 Tex. 545, 7 S.W. 227 (1888). On the other hand, if the occupier owes "no duty" to the invitee because the invitee knows and appreciates the danger, or if the plaintiff deliberately and voluntarily encounters a known risk under the *volenti* doctrine, the plaintiff cannot recover. There may be some exceptions, such as where the plaintiff is motivated by humanitarianism or rescue impulses. Sinclair Refining Company v. Winder, 340 S.W.2d 503, Tex.Civ.App.1960, writ refused. And see Restatement of Torts, § 893.

Another basic difference is that in contributory negligence cases, there must be a finding of proximate cause of the injury; whereas in the "no duty" and *volenti* cases, proximate cause is not an element. Moreover, the test in contributory negligence is generally objective: should plaintiff, as an ordinary, prudent person, have known by the exercise of ordinary care. The test in "no duty" and *volenti,* however, is subjective: did plaintiff know and appreciate. Comment "c" § 496D of the Proposed Restatement of Torts, Second, supra, footnote 3, states, "The standard to be applied is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence."

By and large, the "no duty" and *volenti* doctrines are relatively harsh doctrines which go beyond ascertaining whether the plaintiff failed to exercise ordinary care under the circumstances and hence was contributorily negligent. They bar recovery, generally, without inquiry as to justification or proximate cause. We therefore here feel required to recognize justifiable limits on the doctrines of "no duty" and *volenti*.

As stated, the basis for both the "no duty" and *volenti* doctrines is that the plaintiff knew of the danger and appreciated the consequences of encountering it; or the danger was so apparent that the law would charge him with such knowledge and appreciation. In the "no duty" cases, if the occupier owes the plaintiff no duty, that is all that need be found to defeat plaintiff's recovery. So whether he *voluntarily* exposes himself ordinarily becomes immaterial and goes out of the case. In the *volenti* cases, the defense does not involve the pre-existing duty to protect or warn the plaintiff. See Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172, on rehearing at p. 180. Under the *volenti* defense, voluntary exposure to the known risk has been held to be a necessary inquiry. Sinclair Refining Co. v. Winder, 340 S.W.2d 503, Tex. Civ.App.1960, writ refused.

We shall now analyze some of the major decisions of this Court which have led us to these conclusions.

### I. The Texas *Volenti* Decisions

The *volenti* decisions developed in Texas before the "no duty" cases, and they sprang from cases on "assumed risk." Since the concepts of "assumed risk" and *volenti* are virtually the same, we may look to the early "assumed risk" cases in the development of *volenti*.

In Missouri, K. & T. Ry. of Texas v. Hannig, 91 Tex. 347, 43 S.W. 508 (1897), the defendant requested a charge to the jury that plaintiff could not recover if the method of performing the particular operation was "open and patent to the common observer, and [if] the plaintiff *could have known* these facts by use of ordinary care . . . he assumed the risk incident to his employment, and cannot recover . . .." It was held that the requested instruction was improper: the plaintiff, employee, was not required to use ordinary care to see whether the work was being properly done. "He does not assume the risks . . . unless he *knows* of the failure and the attendant risks, or, in the ordinary discharge of his duty, must necessarily have acquired the knowledge." 43 S.W. at 510.

So the rule was established that in "assumed risk" (volenti) that the plaintiff must know or be charged with knowledge. "Assumed risk" was not raised by submitting "should have known" by the exercise of ordinary care.

The *volenti* doctrine was brought to prominence in Texas in Levlon v. Dallas Ry. & Terminal Co., 117 S.W.2d 876, Tex. Civ.App.1938, writ refused. There the plaintiff's automobile stalled on the defendant's streetcar tracks. The plaintiff got out of his car with the ignition keys "on." His wife, who could not drive, remained in the car. Plaintiff requested defendant's motorman to give his car a push. He did, its motor started, and it took off uncontrolled down the street and crashed into a brick wall. It was held that plaintiff was barred by the doctrine of *volenti non fit injuria*. The pushing was at plaintiff's request, and he consented thereto. While the opinion quotes from *Corpus Juris* about knowledge and appreciation of the danger, the Court actually held that the law charged plaintiff with such knowledge.

The Levlon case just discussed was enlarged upon in Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951). In the Wood case, this Court clearly said that for the *volenti* defense to control, it must be shown that the plaintiff actually knew and appreciated the danger and encountered the risk as the result of an

intelligent choice. No such showing was made; and the facts were such that the Court said the law would not charge the plaintiff with knowledge: "under those circumstances, it could not be said that Wood had either actual or implied knowledge of the specific defect, so we are unwilling to hold that he, of his own free will and as a result of an intelligent choice appreciated the danger . . . ." 238 S.W.2d at 178.

This concept of actual knowledge of facts and being charged in law with appreciation and realization of the danger is the basis for Schiller v. Rice, 151 Tex. 116, 246 S.W.2d 607 (1952). There the lady plaintiff sought damages for injuries received while a passenger in defendant's car. The jury found that she knew and realized that the defendant-driver was drunk, but that she did not act with knowledge of the danger; and her failure to leave the car, when she had the opportunity to do so, was not in reckless disregard of her own safety. While it was held that knowledge and appreciation of the danger is the basis for *volenti,* it was held that plaintiff was chargeable in law with appreciation of the danger; she knew facts which charged her with appreciation. Having knowledge that she was riding with a drunken driver, she could not be heard to say that she did not realize the danger of doing so.

This "actual knowledge" and intelligent choice concept of *volenti* was followed in Dee v. Parish, 160 Tex. 171, 327 S.W.2d 449 (1959), and Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961).

In Dee v. Parish we said, "This [volenti] doctrine is based on knowledge and appreciation of the dangers and voluntary assent thereto." 327 S.W.2d at 452. And in Brown v. Lundell we said, "The doctrine of 'volenti non fit injuria' presupposes a knowledge of the facts so that the actor makes a choice [citing Schiller v. Rice]. In this case it cannot be said that the lessor assumed a known and appreciated risk. [citing Triangle Motors of Dallas v. Richmond]." 344 S.W.2d at 870.

 On the basis of Wood v. Kane Boiler Works, and cases following it, therefore, for *volenti* to be applicable, there must be actual knowledge and appreciation; or the danger must be so open and obvious that the plaintiff is charged in law with knowledge and appreciation thereof. So the plaintiff must know (an issue of fact, usually) or be charged in law with knowledge and appreciation. That being so, the "should have known" of the danger, and "should have appreciated the extent of the danger, if any, in opening the valves," as issues of fact, in this Halepeska case were properly disregarded by the trial court, in so far as the defense of *volenti* is concerned.

It is said that there is *dictum* in McKee v. Patterson that "should have known" and "should have appreciated" are defenses in a *volenti* case. The words do appear in the opinion, though based upon his own testimony, the plaintiff *actually* knew and fully appreciated the danger. But a careful reading of McKee will reveal that the opinion nowhere says "should have known *in the exercise of ordinary care.*" The intent and purpose of the opinion was to say that while a person may not actually know of a danger, he may not close his eyes to obvious dangers. That he "should know" is a defense in law if he has knowledge of facts which would charge him in law with knowledge and appreciation. As so read, McKee is harmonious with this opinion.

II. The Texas "No Duty" Decisions

We turn now to the Texas "no duty" cases, with particular attention being given to the actual holdings in the cases as they have developed. The case generally regarded as announcing the basis for the rule in Texas is Marshall v. San Jacinto Building, Inc., 67 S.W.2d 372 (Tex.Civ.App. 1933, writ refused). There the plaintiff invitee tripped over a slight rise from the sidewalk to the building entrance. Though he had used the entrance many times, the plaintiff testified that he did not notice the rise in level, i. e., he did not know of the

condition. It was held that the condition was open and obvious and that as a matter of law, the building owners owed "no duty" to the plaintiff. An instructed verdict was affirmed. The opinion sets out rules from two texts: From *Corpus Juris,* "The invitee assumes all normal risks . . . and the owner . . . is under no duty . . . as to . . . known and obvious dangers, nor is he liable for injuries to an invitee resulting from a danger which was obvious or *should have been observed in the exercise of reasonable care."* Then the Court quotes from Ruling Case Law what that text said was the true rule: "It is when the perilous instrumentality is *known* to the owner . . . and *not known* to the person injured that a recovery is permitted. . . . And, hence, there is no liability for injuries from dangers that are obvious, or *as well known to the person injured as the owner or occupant."* The opinion then relies upon a Massachusetts case, Hoyt v. Woodbury, 200 Mass. 343, 86 N.E. 772, 22 L.R.A.,N.S., 730, from which it quotes: "Persons entering this building were *charged with knowledge* that they were not entering from a perfectly level sidewalk . . .."

The Court did *not* say that it was an issue of fact, under the *Corpus Juris* statement, whether the defect "should have been observed in the exercise of reasonable care." Rather it followed the Massachusetts case and charged plaintiff with knowledge. It denied recovery under the "no duty" concept.

Thereafter in J. Weingarten, Inc. v. Brockman, 134 Tex. 451, 135 S.W.2d 698 (1940), the plaintiff likewise stumbled over a slight rise from the sidewalk to the defendant's store level. In harmony with the San Jacinto Building case just discussed, the trial court instructed a verdict for defendant. The Court of Civil Appeals reversed. Because of an alleged conflict with the San Jacinto Building case, this Court granted writ of error. Without referring to "open and obvious" or "no duty," this

Court speaking through Commissioner Hickman, affirmed the judgment of the Court of Civil Appeals, saying that issues of fact were raised as to negligence and proximate cause.

But this Court returned to "no duty" in Hausman Packing Co. v. Badwey, 147 S.W.2d 856, (Tex.Civ.App.1941, writ refused). There the plaintiff-invitee slipped on the worn and slippery floor of defendant's refrigerated meat truck. A jury verdict for plaintiff was reversed and judgment was rendered for defendant. The opinion of the Court of Civil Appeals is placed squarely on the San Jacinto Building case and quotes the excerpt from *Corpus Juris* cited in San Jacinto. But the holding of the case is at the end of the opinion: *"Being charged with full knowledge* of these obvious defects . . . he cannot recover for personal injuries caused by such defects or condition." 147 S.W. 2d at 858.

Then we come to the leading case of Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374 (1948). Mrs. Adair, who had been in the bank many times, slipped on its marble stairs. An instructed verdict for the bank was affirmed. The primary holding is that the plaintiff failed to prove any primary negligence or fault on the bank's part. But assuming a dangerous condition (slick stairs) on the bank's part, the Court charged Mrs. Adair with knowledge of the condition and appreciation of the danger, notwithstanding her testimony that she had not noticed the condition theretofore, and did not notice it until she was falling on the stairs. It was held, in effect, that the condition was so open and obvious, and that she had been over it so many times, that as a matter of law she would not be heard to say that she did not know and realize the danger. So the Court said that the bank owed her no duty. The opinion continues, however, to mix "no duty" with *volenti* and assumed risk. It said that plaintiff was barred from recovery because she voluntarily exposed

herself to the risk, and distinguished a case in which assumed risk had not been pleaded.

The Adair case may be said to stand for the proposition that when a condition is patently open and obvious and the danger apparent, and when the plaintiff has encountered it many times, he will be charged in law with knowledge and appreciation, and the occupier owes him no duty. It does not stand for a fact issue of "should have known in the exercise of ordinary care" under the "no duty" concept.

The Adair case is cited in many subsequent cases. In A. C. Burton Co. v. Stasny, 223 S.W.2d 310, (Tex.Civ.App.1949, writ refused), the plaintiff walked into a store through its door, next to which was a plate glass window. In walking out of the store, he walked through the window. He knew it was there. He had seen it as he went in. The jury found that (as he went out) he did not know the glass was there. The judgment for the plaintiff was reversed and judgment was rendered for the defendant. The plaintiff was actually *charged* with knowledge and appreciation, but the court said, "the danger . . . was obvious to appellee or . . . should have been observed by him in the exercise of reasonable care."

The Adair case was distinguished in Hall v. Medical Bldg. of Houston, 151 Tex. 425, 251 S.W.2d 497 (1952), where the plaintiff was struck by a suddenly opened door in the lobby of defendant's building. The plaintiff testified that she had no previous knowledge of the dangerous condition, and there was no evidence that she had knowledge of how the door operated. The Court would not charge her in law with knowledge as was done in Adair, and it was not suggested that fact issues of "should have known" should have been submitted. The Court said that the basis of liability in the "no duty" cases was the superior knowledge of the danger on the part of the occupier; and that there were many cases denying liability under "no duty" because

"the danger was as well known to the one (the invitee) as to the other (the occupier)."

Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953), involved an occupier-invitee situation in which *volenti* was strongly urged. The plaintiff, a plumber, had been repairing a drain on the second floor. He was calling down through an open, unguarded elevator shaft for his tools when he was struck from above by the descending elevator. The elevator had just a floor for lifting automobiles and no top as is customary with passenger elevators. He thought he saw the elevator on the floor below. He realized the danger of falling down the shaft and had lain on his stomach to avoid that danger. But he had no actual knowledge of the descending elevator. This Court held that *volenti* depended upon full (actual) knowledge of the danger so that the plaintiff encounters the risk as the result of an intelligent choice, citing Wood v. Kane Boiler Works. As to the Adair "no duty" case, this Court would not charge the plaintiff Richmond with knowledge of the danger. Unlike Mrs. Adair who had been many times upon the stairs, Richmond had used the elevator but once. As the Court stated it, it was not the philosophy of Adair that "one trip through a hall of dangers" would be sufficient to charge the plaintiff with knowledge and appreciation of every danger. The judgment for the defendant was reversed and the cause was remanded to have the jury pass upon issues of contributory negligence; whether plaintiff "should have known" that what he saw on the first floor was the elevator, and that hence the elevator was above him and might strike him. In support of this action this Court cited contributory negligence cases.

In none of the above cases has it been held that fact findings that the plaintiff, in the exercise of ordinary care, (1) should have known and (2) should have appreciated, the danger, will defeat a recovery in the "no duty" concept. In each

of them, there have been findings that the plaintiff *knew and appreciated,* or that as a matter of law he was charged with knowledge and appreciation. In the sense that he is charged, in law, with knowledge and appreciation, the plaintiff "should have known" and "should have appreciated." But there has been no inquiry of the jury whether the plaintiff, in the exercise of ordinary care, should have known and appreciated.

So we return once more to McKee v. Patterson. It was there clear and undisputed that plaintiff had actual knowledge and appreciation of the danger of working on the ladder on the slick floor. He had previously complained about the slick floor. The holding was that since the invitee-worker had full knowledge and appreciation of the danger, the occupier owed him no duty. If there was no duty, the defendant obviously breached no duty; and hence judgment was for defendant. The Court observed that the same result would be reached under *volenti*: the facts were undisputed that with full knowledge and appreciation of the danger, the plaintiff deliberately encountered the risk. In stating the general rules of "no duty" and *volenti*, the Court said that where the plaintiff knows and appreciates, or *should know and appreciate,* he cannot recover. It did not say *"in the exercise of ordinary care* should know." So the Court was thinking, in terms of the foregoing previous cases, that plaintiff, in the "no duty" cases could not recover if he *knew* and *appreciated* or was charged in law with knowledge and appreciation. In McKee the Court did make the statement, now disapproved, that in the application of the "no duty" and *volenti* concepts, whether the plaintiff *should have known* and *appreciated* is sometimes a jury question.

■ The jury in this case found that Callihan was negligent in failing sufficiently to stake the flow pipe, that this was negligence and a proximate cause of Halepeska's death. It found further, that, be-

fore the valves were opened, Halepeska did not have full knowledge of the manner in which the well was equipped and that he did not appreciate the danger in opening the valves. The evidence, reviewed above at length, is not such as to charge him in law with knowledge and appreciation of danger.

The Court of Civil Appeals reversed the judgment of the trial court because of the additional jury findings that: (20–A) *in the exercise of ordinary care,* Halepeska should have had full knowledge of the manner in which the wells are equipped; (20–B) *in the exercise of ordinary care,* Halepeska should have appreciated the extent of the danger in opening the valves; and (20–C) Halepeska voluntarily exposed himself to such danger, if any, which *in the exercise of ordinary care,* he should have known and appreciated.

These latter issues were probably submitted by the trial court under the language of McKee v. Patterson that "should have known" and "should have appreciated" may be fact questions. The opinion of the Court of Civil Appeals squarely placed its opinion on this assumption, citing McKee, Adair, and A. C. Burton Co. v. Stasny discussed above. We have determined that this was and is an erroneous concept. The Court of Civil Appeals therefore erred in reversing the judgment of the trial court and in rendering judgment for Callihan that Mrs. Halepeska et al. take nothing.

Having found error in the opinion and judgment of the Court of Civil Appeals, we turn to a proper disposition of the case in this Court.

■ Even if we assume that the findings that Halepeska should have known and appreciated the danger are findings of contributory negligence, they cannot, in this Court, form the basis for a judgment for the defendant because there is no supporting finding of proximate cause. The judgment of the trial court was for the plaintiffs. Hence, if there were a presumed

finding, it would be in support of the judgment: that there was not proximate cause to support the negligence issues.

As stated, Callihan has a point here, as it did in the Court of Civil Appeals, that the trial court erred in failing to submit issues to the jury on whether Halepeska opened the valves, whether he opened them in a negligent manner, and whether this was a proximate cause of his injury. Plaintiffs requested similar issues as to whether Morris opened the valves. In view of the testimony reviewed above, the opening of the valves and the manner in which they were opened played an important role in the accident. Whether there is sufficient evidence to raise a fact issue as to whether Halepeska opened the valves is a close question. Each of the men had expressed a belief that the well should be blown and both went to blow it. Morris had heard Russell say the well should be "blowed" hard to get the water out of it. Morris had observed Russell when Russell blew the well. He had told Fuller, Callihan's superintendent, that the well ought to be "blowed", and Howell testified that Morris had told him *how* the well should be equipped for blowing. Morris was found just a few feet from the well and the original situs of the valves. He was found to the southwest of the well where he might have been knocked by the first clockwise movement of the "L" joint on which the two-inch valve was situated. In other words, he was found closer to where the valves had been, from which it might be inferred that he was opening the valves. But he was struck in the back; the back of his head was bleeding and there was blood between his shoulders. So his back must have been to the well when he was injured. Halepeska, on the other hand, had said that the well "needed to be blowed down harder." He objected to the way it had been blown before. He was found some 25 to 30 feet from the well across a slush pit to the southeast of the well. His left footprint was three or four feet from him, in a line with the well. In the same slush pit was the two-inch valve, the one which

was probably opened last and which was generally regarded as the critical valve. So Halepeska was nearest the two-inch valve after the accident. There was evidence from plaintiffs' witness Gruy that gas blown from the well at its great pressure could kill a man. Halepeska's clothes were blown off, and the gas could have blown him from near the well to the place where he was found, with the two-inch valve. But even if we place Halepeska at or near the well, there is absolutely no evidence as to who turned the valves on. The witness Bryant said that "they" [both Halepeska and Morris] were going to the well to open the valves just before they were killed.

■ While a factual determination as to who turned on the valves and in what manner would be of great assistance, any determination would be based on speculation and not evidence. We agree with the trial court that on this record there was not evidence to raise the issues as to whether Halepeska (or Morris) turned on the valves. The trial court therefore did not err in failing to submit these issues. '

■ The defendant Callihan did not request any other contributory negligence issues. Even if we assume that from the defendant's standpoint that the case was tried on the wrong theory, we cannot order a reversal and remand for a new trial unless we also find error in the trial court's judgment. Davis v. Davis, 141 Tex. 613, 175 S.W.2d 226 (1943).

Callihan has one other point in the Court of Civil Appeals, and here by cross point, which, if sustained, would call for a remand. That is on jury argument of plaintiffs' counsel in his closing argument. The argument was:

> "Mr. Brown: Mrs. Farnsworth doesn't owe Mrs. Halepeska anything. Don't be mislead, Ladies and Gentlemen of this jury. Don't be fooled. Lawsuits are tried under certain rules and things that can or cannot be brought before you.. I want to tell you this, that Mrs.

**386**

Farnsworth and Mrs. Halepeska are friends, and when you write the just verdict—"

At this point defendant's counsel objected, and out of the hearing of the jury, defendant's counsel said to the court that this injected insurance into the case which would cover any judgment rendered. The court instructed the jury as follows:

"The Court: Just a minute, Mr. Brown. (The Court addressing the jury) You will not consider the statement of Counsel that lawsuits are tried on things that can or cannot be brought before you. You will decide this case on the things that are brought before you and not consider that statement of Counsel.

"All right, go ahead.

"Mr. Brown: They are friends, and when you write the verdict that you should write in this case, and find the damages that have not been challenged in this case, they will remain so."

The trial court qualified defendant's bill of exception as follows: (1) "no further objection was made or instruction requested during the remainder of said argument"; (2) the plaintiff was not seeking any judgment against Mrs. Farnsworth individually but only against Callihan Corporation; no issue was submitted as to the liability or fault of Mrs. Farnsworth; (3) the argument did not inject insurance into the case; insurance was not mentioned; and (4) the argument was made in reply to the argument of defendant's counsel that Mrs. Farnsworth was the principal owner of the corporation: "It is indeed an important case to her when she has been sued and it is contended that she owes someone $450,000. * * * I say to you that if you read the Court's charge you will be impressed by the fact that damages alone do not entitle people to take money from someone and take it themself. * * * and I sincerely say when you review that evidence and apply it, you will say that while there might

be damages, *Mrs. Farnsworth doesn't owe Mrs. Halepeska for them . . . .*"

Counsel for Callihan contend that plaintiffs' counsel's argument injected insurance into the case. On motion for new trial, defense counsel demonstrated that Callihan's liability insurance was only $100,000, and that the corporation would owe the excess of the amount sued for, if recovered by plaintiffs.

Callihan also complains that plaintiffs' counsel referred to "The Golden Rule," by saying, "I can only hope that in the discharge of your duties that you will be governed by the one rule, the golden rule." This was held not to be reversible error in Rio Grande, E. P. & S. F. Ry. Co. v. Dupree, 55 S.W.2d 522, Tex.Com.App.1932.

■ In view of the trial judge's instructions to the jury and his qualifications to Callihan's bill of exceptions, we cannot say that the argument was calculated to cause and probably did cause the rendition of an improper judgment. Rule 503 Texas Rules of Civil Procedure.

■ Callihan had points of error in its brief in the Court of Civil Appeals that the jury's answers were against the great weight and preponderance of the evidence and were not supported by sufficient evidence. There is some evidence to support these findings, and the points that there was no evidence thereon are overruled. But the sufficiency of the evidence is for the Court of Civil Appeals to pass upon. Accordingly, the judgment of the Court of Civil Appeals is reversed and the cause is remanded to the Court of Civil Appeals in order to enable that Court to pass upon those points of error.

GRIFFIN, Justice (dissenting).

I agree with the opinion of the Court of Civil Appeals.

CULVER, J., joins in the dissent.