# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 27, 2013

Lyle W. Cayce
Clerk

No. 12-10772

RANDY J. AUSTIN,

Plaintiff-Appellant,

v.

KROGER TEXAS L.P., doing business as Kroger Store #209,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before ELROD and HIGGINSON, Circuit Judges, and JACKSON, District Judge.[1]

JENNIFER WALKER ELROD, Circuit Judge:

This case arises out of injuries that Plaintiff-Appellant Randy Austin sustained while performing his duties as an employee for Defendant-Appellee Kroger Texas, L.P. ("Kroger"). For the reasons stated below, we AFFIRM the district court's judgment with respect to Austin's gross negligence claim and REVERSE and REMAND with respect to his premises liability and ordinary negligence claims.

---

[1] District Judge of the Middle District of Louisiana, sitting by designation.

I.

Austin was a long-time Kroger employee. Beginning in 1997, Austin served in various maintenance positions; in 2008, he became a "utility clerk" or "floor clean-up person" at a Mesquite, Texas, Kroger store. His duties included sweeping, mopping, sacking groceries, consolidating carts, and cleaning the store's restrooms. When cleaning spills, Austin typically used a chemical absorbing powder called "Spill Magic," which Kroger's Safety Handbook notes "absorbs many times its own volume in liquid, water, oil, . . . etc." Spill Magic allows an employee to clean a liquid spill with a broom and dustpan, and—according to Kroger's Safety Handbook—reduces the likelihood of a slip-and-fall by 25 percent.

Kroger management decided to perform an annual cleaning of the store's condenser units, housed on the "mezzanine level" of the building, on the morning of July 27, 2009. Kroger employees, including Kroger's in-house mechanic, power-washed the condensers with water and cleaning solvent for about twenty minutes. As a result, a dirty brown liquid pooled on the mezzanine floor. Because the room that contained the condensers had no drain to divert the liquid, some of the fluid leaked into the ventilation ducts that opened into the downstairs restrooms.

That same morning, Kroger asked Austin, a night-shift employee, to report to work to cover for an absent colleague. When he arrived, a Kroger employee informed Austin about the condenser cleaning and asked him to be prepared to clean up "whatever mess" it made.

Austin inspected the restrooms in accordance with his normal routine. At about 9:45 in the morning, he discovered a small puddle of brown, oily liquid in the women's restroom. Although Kroger's Safety Handbook provided that

store management should "make certain that the Spill Magic Spill Response Stations [were] adequately supplied at all times" and available in numerous places throughout the store, none was available that day. Accordingly, Austin cleaned the spill with a dry mop and bucket. When Austin moved on to the men's restroom, he saw that the same substance covered about 80 percent of the floor. He placed "Wet Floor" signs inside and outside of the room, and proceeded to mop the spill for about thirty to thirty-five minutes. He took "baby steps" in and out of the restroom to change out the mop head numerous times, and successfully removed about 30–40 percent of the liquid.

At about 10:30 a.m., while continuing to remedy the spill, Austin fell. He sustained a left femur fracture and severely dislocated his hip. He spent nine months in the hospital and underwent six surgeries, and his left leg is now two inches shorter than his right.

Austin filed suit in Texas state court, asserting negligence, premises liability, and gross negligence claims against Kroger, a non-subscriber to the Texas workers' compensation system. Kroger removed on the basis of diversity jurisdiction, and subsequently moved for summary judgment. The district court granted Kroger's motion—based in part on Austin's subjective awareness of the risk the spill presented—and dismissed Austin's claims with prejudice.[2] Austin timely appealed.

## II.

We review *de novo* a district court's grant of summary judgment, applying the same standard as the district court. *Ford Motor Co. v. Tex. Dep't of Transp.*,

---

[2] Specifically, the district court concluded that, "[g]iven that Austin was aware of the risk that he faced when mopping the spill, and in fact acted to inform others that the men's bathroom was wet," "no reasonable jury could infer that" Kroger owed Austin a duty to warn.

264 F.3d 493,

498 (5th Cir. 2001) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford*, 264 F.3d at 498 (citing *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994)).

## III.

Texas law governs in this diversity suit. To determine Texas law, we look first to the final decisions of the Texas Supreme Court, beginning with the most recent. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007); *Ford Motor Co. v. Dall. Power & Light Co.*, 499 F.2d 400, 410 n.17 (5th Cir. 1974) ("This discussion by the [Texas] Supreme Court . . . is the highest and most recent authority available and we are *Erie*-bound by it."). In the absence of a final decision by the Texas Supreme Court on an issue, we must make an "*Erie* guess" and determine how that court would resolve the issue if presented with the same case. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010). In making an *Erie* guess, we rely on the following:

> (1) decisions of the Texas Supreme Court in analogous cases, (2) the rationales and analyses underlying Texas Supreme Court decisions on related issues, (3) dicta by the Texas Supreme Court, (4) lower

4

state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which Texas courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Id.* (alterations omitted) (quoting *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 199 (5th Cir. 2006)).

IV.

The starting point for our analysis in this case is the Texas Workers' Compensation Act (the "TWCA"), which effects the scope of both Austin's claims and Kroger's defenses. In Texas,

[t]he workers' compensation act was adopted to provide prompt remuneration to employees who sustain injuries in the course and scope of their employment. . . . The act relieves employees of the burden of proving their employer's negligence, and instead provides timely compensation for injuries sustained on-the-job. . . . In exchange for this prompt recovery, the act prohibits an employee from seeking common-law remedies from his employer, as well as his employer's agents, servants, and employees, for personal injuries sustained in the course and scope of his employment.

*Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 142 (Tex. 2003) (quoting *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 206–07 (Tex. 2000)). Thus, by participating in a workers' compensation scheme, "employers gain immunity from tort actions that might yield damages many times higher than awards payable under workers' compensation schedules." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006); *see HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 358 (Tex. 2009) (discussing the balance achieved by the Texas workers' compensation system); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 521 (Tex. 1995) (same); *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 407 (Tex. 1985) (same).

Texas allows employers to opt-out of its workers' compensation program.

Tex. Lab. Code § 406.002(a). "But the state makes that choice an unattractive one." *Hook v. Morrison Milling Co.*, 38 F.3d 776, 778 (5th Cir. 1994). Specifically, the TWCA vests employees of non-subscribing employers with the right to sue their employers for work-related injuries or death. *Id.*; *see* Tex. Lab. Code § 406.033(a). In such an action, the TWCA deprives a non-subscribing employer of the right to raise certain defenses, including contributory negligence, assumption of the risk, and the fellow-servant rule. Tex. Lab. Code § 406.033(a)(1)–(3); *see also Kroger Co. v. Keng*, 23 S.W.3d 347, 352 (Tex. 2000) (holding "that a non-subscribing employer is not entitled to a jury question on its employee's alleged comparative responsibility"). Thus, the Texas "workers' compensation construct contemplates two systems, one in which covered employees may recover relatively quickly and without litigation from subscribing employers and the other in which non subscribing employers . . . are subject to suit by injured employees to recover for their on-the-job injuries." *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 187 (Tex. 2012).

While there is a bias in favor of workers' compensation coverage, the TWCA does not create an "especially punitive litigation regime for non subscribing employers." *Id.* at 192. As this court recognized in *Rentech Steel*, a non-subscribing employer has no automatic obligation to compensate its injured employee. 620 F.3d at 565. Rather, an employee-plaintiff must prove the elements of his negligence or other claim just as any other litigant, subject to the parameters of section 406.033(d) of the Texas Labor Code. *Id.* In other words, section 406.033(a)(1)–(3) may limit an employer's defenses, but it does not eliminate an employee's burden to establish his common law claim. *See Rentech Steel*, 620 F.3d at 565; *see also Tex. W. Oaks*, 371 S.W.3d at 187; *Simon v. Johns Cmty. Hosp.*, No. 03-07-00057-CV, 2008 WL 2309295, at *2–3 (Tex.

App.—Austin June 4, 2008, no pet.) (unpublished but persuasive).

Here, Austin asserts three common-law claims arising out of his workplace injury: premises liability, ordinary negligence, and gross negligence. We turn first to Austin's premises liability claim.

## A.

Under Texas law, the first step in evaluating Austin's premises liability claim is determining the nature and scope of Kroger's duty. *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 217 (Tex. 2008) ("Like any other negligence action, a defendant in a premises case is liable only to the extent it owes the plaintiff a legal duty." (citations omitted)). Whether a duty exists "is a question of law for the court and turns 'on a legal analysis balancing a number of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant.'" *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010) (quoting *Moritz*, 257 S.W.3d at 218). The Texas Supreme Court has emphasized that an employer's duty to his employees may be identical "in all material respects" to a landowner's duty "to use reasonable care to make his premises reasonably safe for the use of his invitees." *Sears, Roebuck & Co. v. Robinson*, 280 S.W.2d 238, 240 (Tex. 1955).[3] Thus, the Texas Supreme Court

---

[3] Although the "two fields of law (landowners-invitee and master-servant) are entirely separate," *Sears, Roebuck & Co. v. Robinson*, 280 S.W.2d 238, 240 (Tex. 1955), Texas courts generally apply premises-liability principles in suits by injured employees. *See, e.g.*, *Leal v. McDonald's Corp.*, No. 03-05-00500-CV, 2009 WL 2410853, \*4 (Tex. App.—Austin Aug. 5, 2009, no pet.) (unpublished but persuasive) ("Employers owe their employees the same duty of care that premises owners owe invitees." (citing *Allen v. Connolly*, 158 S.W.3d 61, 65–66 (Tex. App.—Houston [14th Dist.] 2005, no pet.))); *Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 644 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (applying standard elements of a premises liability claim to a non-subscriber case); *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 71 (Tex. App.—Austin 1998, no pet.) (same); *Villalobos v. Fiesta Mart, Inc.*, No. 01-93-00969-CV, 1994 WL 543311,\*1–2 (Tex. App.—Houston [1st Dist.] Oct. 6, 1994, no pet.) (unpublished but persuasive) (same); *Moore v. J. Weingarten, Inc.*, 523 S.W.2d 445, 447–48 (Tex. Civ. App.—Beaumont 1975, writ ref'd n.r.e.) (same). In the employment context, Texas

has repeatedly held that an employer owes a continuous, non-delegable duty to provide its employees with a safe workplace. *See, e.g.*, *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006); *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996); *see also Farley v. M M Cattle Co.*, 529 S.W.2d 751, 754 (Tex. 1975), *overruled on other grounds by Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex. 1978). An employer must, for example, warn an employee of the hazards of employment and provide needed safety equipment or assistance. *Elwood*, 197 S.W.3d at 794; *Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex. 1995); *Farley*, 529 S.W.2d at 754. An employer must also furnish reasonably safe instrumentalities with which its employees are to work. *Farley*, 529 S.W.2d at 754.[4]

Before the district court, Austin alleged that Kroger breached these duties when it failed to maintain a safe premises for him to work and failed to provide him with Spill Magic, an instrumentality necessary for safe clean-up of the spill. The district court rejected Austin's premises liability claim for three reasons: (1) Austin was well aware of the risks presented by the spill at the time of his injury; (2) there is no basis to conclude that Kroger breached its duty by failing to provide Spill Magic; and (3) Kroger had no actual or constructive knowledge of the spill. We address each ground for summary judgment below.

1.

The most critical and extensively briefed question on appeal is whether

---

courts first look to the employer's duty to provide a safe workplace in assessing a plaintiff's claim. *See Del Lago*, 307 S.W.3d 762, 767 (Tex. 2010); *Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 461 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

[4] Despite these general duties, however, an employer is not an insurer of its employees' safety. *Elwood*, 197 S.W.3d at 794 (citing *Leitch*, 935 S.W.2d at 117; *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993)).

Austin's subjective knowledge of the spill[5] precludes his recovery as a matter of law. Considering Texas courts' treatment of a doctrine called the "no duty rule," we answer no.

i.

For decades, Texas maintained the "no duty rule" in premises liability cases, which provided that a landowner owed no duty to remedy known and obvious dangers on a premises. *See Sears, Roebuck*, 280 S.W.2d at 240 (describing the "no duty rule"). Accordingly, the rule required a plaintiff to negate his own knowledge and appreciation of the danger as a prerequisite to recovery. *See Halepeska v. Callihan Interests, Inc.*, 371 S.W.2d 368, 378–79 (Tex. 1963), *abrogated by Parker*, 565 S.W.2d at 517; *see also Thomas v. Internorth, Inc.*, 790 F.2d 1253, 1255–56 (5th Cir. 1986) (explaining the Texas "no duty rule").[6] The Texas Supreme Court explained the "no duty" rule in *Halepeska*, 371 S.W.2d at 378–79, in helpful detail:

> The "no duty" doctrine is this: the occupier of land or premises is required to keep his land or premises in a reasonably safe condition for his invitees. This includes a duty of the occupier to inspect and

[5] There is no genuine dispute that Austin was aware that the spill posed a risk. He set out three Wet Floor signs, took baby steps in and around the spill, and understood that the substance on the floor was slick and oily. Although Austin contends that this spill was of a different nature and volume than those he regularly cleaned, he does not argue that the size of the spill was unknown to him at the time of the incident. In addition, Austin does not contest his knowledge that Kroger encouraged its employees to use Spill Magic and that Spill Magic was unavailable on the day of his injury.

[6] At oral argument, Kroger asserted for the first time that our decision in *Internorth* resolves this case. We disagree. *Internorth* arises in a different context, and—in relevant part—merely restates the non-controversial principle that the "abrogation of the no-duty rule does not relieve a plaintiff from proving that the defendant had a duty and breached it." *Id.*; *see Dixon v. Van Waters & Rogers*, 682 S.W.2d 533, 533–34 (Tex. 1984) (noting that *Parker's* "rule that the plaintiff does not have the burden to obtain findings that disprove his own fault does not, however, mean that a plaintiff is excused from proving the defendant had a duty and breached it").

to discover dangerous conditions. His duty is to protect his invitees from dangers of which he, the occupier, knows, or (because of his duty to inspect) of which he should know in the exercise of ordinary care.  If there are dangers which are not open and obvious, he is under a duty to take such precautions as a reasonably prudent person would take to protect his invitees therefrom or to warn them thereof. *But if there are open and obvious dangers of which the invitees know, or of which they are charged with knowledge, then the occupier owes them 'no duty' to warn or to protect the invitees.* This is so, the cases say, because there is "no duty" to warn a person of things he already knows, or of dangerous conditions or activities which are so open and obvious that as a matter of law he will be charged with knowledge and appreciation thereof.

. . .

So in a suit by an invitee against the occupier, the invitee must not only prove that he was injured as a proximate result of encountering a condition on the premises involving an unreasonable risk of harm, *but he must also prove, as part of the plaintiff's case, that the occupier owed him a duty to take reasonable precautions to warn him or protect him from such danger, i. e., the plaintiff must negative "no duty."* This is the 'no duty' referred to in cases.

*Id.* (emphasis added) (citations omitted).

Although employees are the invitees of their employers, the Texas Supreme Court declined to apply the "no duty rule" in the employment context, as doing so would "defeat and nullify" the "obvious and clearly expressed intention of the Legislature" to (1) eliminate a non-subscribing employer's assumption-of-the-risk defense, and (2) "make him liable where he created or failed to correct an unsafe condition of the premises on which his servant was compelled to work." *Sears, Roebuck*, 280 S.W.2d at 240.

More than twenty years after *Sears, Roebuck*, the Texas Supreme Court abolished the "no duty rule" altogether in premises liability cases. Calling the rule "harsh," the court noted that it caused unnecessary confusion and

duplicated the voluntary-assumption-of-risk defense. *Parker*, 565 S.W.2d at 518. The court noted that there are "many instances in which a person of ordinary prudence may prudently take a risk about which he knows, or has been warned about, or that is open and obvious to him. His conduct under those circumstances is a matter which bears upon his own contributory negligence." *Id.* at 520. Thus, the court concluded that "a plaintiff's knowledge, whether it is derived from a warning or from the facts, even if the facts display the danger openly and obviously, *is a matter that bears upon his own negligence; it should not affect the defendant's duty*." *Id.* at 521 (emphasis added). In other words, a "plaintiff may be contributorily negligent as a matter of law by reason of his conduct after he possesses knowledge of the condition." *Id.*

The Texas Supreme Court has confirmed the abolition of the "no duty rule" in two recent premises liability cases. *See Moritz*, 257 S.W.3d at 216–17; *Del Lago*, 307 S.W.3d at 772–73. In *Moritz*, the Texas Supreme Court held that a landowner need only warn the employees of an independent contractor working on its premises about concealed defects, not defects that are open and obvious.[7] *Moritz*, 257 S.W.3d at 215–16. The court rejected a dissenter's criticism that its holding abrogated *Parker*, stating: "We do not . . . overrule *Parker*, comparative

---

[7] The court emphasized that, in the narrow context of independent contractors working on a premises, the landowner turns control "over to someone else in a way that is not true of shoppers, sightseers, or other business invitees." *Moritz*, 257 S.W.3d at 215. Specifically,

> one who hires an independent contractor generally expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings. Placing the duty on an independent contractor to warn its own employees or make safe open and obvious defects ensures that the party with the duty is the one with the ability to carry it out.

*Id.* at 215–16.

negligence, or principles of premises liability law." *Id.* at 217. "Nor is analysis of a defendant's duty 'no different' from analysis of a plaintiff's negligence. It is true that when a hazard is obvious, the plaintiff will usually know about it. But that does not mean the plaintiff is negligent, as some . . . must encounter a hazard because they have no other choice." *Id.* at 218.

Two years after *Moritz*, the Texas Supreme Court again reaffirmed the abolition of the "no duty rule." In *Del Lago*, a third-party patron filed suit after he suffered injury in a bar fight. 307 S.W.3d at 764–65. Characterizing the plaintiff's claim as one for premises defect (based on insufficient security at the property), the court concluded that there was legally sufficient evidence to support the jury's allocation of 51 percent negligence to the premises owner and 49 percent to the plaintiff. *Id.* at 764–65, 767.

Justice Johnson dissented, joined by Justice Hecht. *Id.* at 777. The dissent emphasized that "[t]he purpose of requiring premises occupiers to warn invitees of unreasonably dangerous conditions" is to provide the invitee with sufficient information to decide "(1) whether to come onto or remain on the premises, accept the risk of harm posed by the condition, and take action to avoid or protect himself from the risk or (2) refuse to accept the risk by either not coming onto the premises or by leaving." *Id.* at 783 (Johnson, J., dissenting) (citation omitted). Because the plaintiff in *Del Lago* was aware of the dangers at issue, Justice Johnson would have held that the premises owner did not breach its duty as a matter of law. *Id.* at 784. ("It is contrary to both common sense and logic to impose liability on Del Lago because its employees did not warn Smith during the evening that 'members of Sigma Chi and a wedding party are drinking, acting belligerently toward and threatening each other,' or

take similar action when, according to Smith's own testimony, he knew as much as the warning would have conveyed.").

Justice Willett, writing for the *Del Lago* majority, disagreed with Justice Johnson's view:

> A plaintiff's appreciation of and voluntary exposure to a dangerous on-premises risk is something the jury can weigh when apportioning responsibility, as was done in this case. Further, we have expressly abolished a "no-duty" doctrine previously applicable to open and obvious dangers known to the invitee. Instead, a plaintiff's knowledge of a dangerous condition is relevant to determining his comparative negligence but does not operate as a complete bar to recovery as a matter of law by relieving the defendant of its duty to reduce or eliminate the unreasonable risk of harm. *A plaintiff's knowledge, whether it is derived from a warning or from the facts, even if the facts display the danger openly and obviously, is a matter that bears upon his own negligence; it should not affect the defendant's duty.* While presented in terms of a no-negligence or no-causation analysis, Justice Johnson's view would in effect revive the no-duty rule rejected by statute and caselaw, and hold as a matter of law that an invitee's decision not to remove himself from a known and dangerous premises condition bars any recovery against the landowner.

*Id.* at 772–73 (citations and internal quotation marks omitted). Thus, at least in the context of third-party premises-defect claims, *Del Lago* affirms that *Parker* and its abolition of the "no-duty rule" remains good law.

Viewed in tandem, *Sears, Roebuck, Parker, Moritz*, and *Del Lago* illustrate that a non-subscribing employer cannot escape liability in Texas based solely on its employee's knowledge of the risk at issue. That is because the employee's subjective awareness of the hazard is relevant only to comparative negligence or assumption-of-the-risk—affirmative defenses unavailable to non-subscribers under Section 406.033(a) of the Texas Labor

Code.  Applying these cases to the facts at issue here suggests that Austin's subjective knowledge of the spill, standing alone, is not enough to support summary judgment in favor of Kroger.

ii.

But the analysis is not so simple, says Kroger.  It cites a line of pre-*Del Lago* cases in which the Texas Supreme Court rejected employees' claims against their non-subscribing employers based, at least in part, on the obviousness of the risk that led to their injury.  *See Elwood*, 197 S.W.3d at 795, *Jack in the Box, Inc. v. Skiles*, 221 S.W.3d 566, 568 (Tex. 2007), *Brookshire Grocery Co. v. Goss*, 262 S.W.3d 793, 794 (Tex. 2008), and *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 413 (Tex. 2009).  In *Elwood*, for example, an employee suffered injury when a Kroger customer shut her vehicle door on the employee's hand while he was loading her car with groceries; the employee had placed one hand in the doorjamb of the vehicle and one foot on the grocery cart to keep it from rolling down a slope in the Kroger parking lot.  *Elwood*, 197 S.W.3d at 794.  The employee alleged that Kroger "provided inadequate training on how to maneuver carts on a sloped parking lot, never advised that he should take a second clerk with him to the sloped portion of the lot, and provided no explanation on how to avoid injury when loading groceries into customers' vehicles."  *Id.*  He further alleged that Kroger should have provided carts with locking wheels or wheel blocks.  *Id.*  The Texas Supreme Court rejected the plaintiff's claims, noting that "Kroger had no duty to warn Elwood of a danger known to all and no obligation to provide training or equipment to dissuade an employee from using a vehicle doorjamb for leverage."  *Id.* at 795.  In addition, it noted that there was no evidence that safe grocery-loading

required carts with wheel locks or additional personnel. *Id.*

*Skiles, Goss*, and *Escoto* address similar situations. In *Skiles*, the Texas Supreme Court rendered a take-nothing judgment against an employee who suffered injury when he used a ladder to climb over a non-functioning lift gate to obtain supplies for his employer. 221 S.W.3d at 568. The Court emphasized that "[t]he dangers associated with the use of a ladder to climb over a lift gate are common and obvious to anyone" and, therefore, "Jack in the Box owed no duty to warn Skiles of the danger posed by his intended use of the ladder." *Id.* at 569. In *Goss*, the Texas Supreme Court rejected an employee's claim that her employer failed to adequately warn her about the risks of maneuvering around lowboy carts: "like avoiding sticking one's hand in a door, stepping over a cart is a risk commonly known to anyone." 262 S.W.3d at 794–95. Finally, in *Escoto*, the Texas Supreme Court declined to impose a "duty to train employees regarding the commonly-known dangers of driving while fatigued." *Escoto*, 288 S.W.3d at 413.

We are not persuaded that *Elwood*, *Skiles*, *Goss*, or *Escoto*—all of which predate *Del Lago*—affect the outcome of this case. Unlike Austin, the employees in *Elwood*, *Skiles*, *Goss*, and *Escoto* made a voluntary decision to engage in risky behavior unnecessary to the performance of their duties, such as placing a hand in the doorjamb of a car, climbing over a locked lift-gate, stepping over a lowboy cart in a crowded store room, and driving while exhausted. While the employees may have engaged in these activities in the course and scope of their work, nothing inherent in their job obligations required them to take the risks at issue. For example, the *Elwood* plaintiff could have loaded the groceries without placing his hand in the car doorjamb.

15

The Texas Supreme Court also emphasized that in each of those cases *anyone* would know that the employee's choice involved a risk. Here, on the other hand, Austin's injury arises out of an unusually large, particularly slick spill that he had no choice but to confront.[8] As counsel for Kroger acknowledged at oral argument, Austin's duties as the floor maintenance person included remedying such hazards to ensure that the Kroger premises was safe for customers. Indeed, Kroger's own Safety Handbook provided that the individual on "floor duty" should be "constantly sweeping, spot mopping, and taking care of identifying spills or problems as such are noticed and identified." Thus, the concern expressed in Justice Johnson's dissent in *Del Lago* does not apply: Austin, unlike a third-party patron, did not have the option to "refuse to accept the risk by either not coming onto the premises or by leaving." 307 S.W.3d at 783 (Johnson, J., dissenting) (citation omitted). He could either quit, or clean. He chose to clean. And unlike the employees in *Elwood*, *Skiles*, *Goss*, and *Escoto,* nothing in the record here indicates that Austin performed his duties in a manner that would obviously increase his risk of injury. To the contrary, Austin testified that he attempted to avoid slipping by taking baby steps. He bases his claim in large part on the allegation that he sought to use Spill

---

[8] Conversely, the tasks at issue in *Elwood*, *Skiles*, *Goss*, and *Escoto*—loading groceries, obtaining supplies, and driving—were not inherently or unusually dangerous. *See, e.g.*, *Elwood*, 197 S.W.3d at 795 ("[W]hen an employee's injury results from performing the same character of work that employees in that position have always done, an employer is not liable if there is no evidence that the work is unusually precarious. . . . In this case, there is no evidence that loading groceries on the sloped portion of Kroger's parking lot is an unusually dangerous job." (citations omitted)); *Goss*, 262 S.W.3d at 795 ("As in *Elwood* and *Skiles*, there was no evidence here that keeping a loaded lowboy in a cooler was unusually dangerous. A stationary, loaded lowboy is easily visible, and Goss saw it upon entering the cooler. To the extent that stepping over a lowboy is dangerous, it is a danger apparent to anyone, including Goss.").

16

Magic—a product that Kroger advised its employees to use to *reduce* the likelihood of a slip-and-fall—but Kroger failed to provide it.

We observe that this case, unlike *Elwood*, *Skiles*, *Gross*, and *Escoto*, does not center on an alleged failure to warn. Rather, Austin argues that a warning cannot absolve an employer from liability if the employee must confront a dangerous defect anyway. We agree. In that narrow context, an employer must either make the premises safe or provide its employee with the necessary instrumentalities to avoid or remedy the defect himself. As the Texas Supreme Court noted in *Del Lago*, "[i]n some circumstances, no warning can suffice as reasonably prudent action to reduce or remove an unreasonable risk." 307 S.W.3d at 774.

In sum, this is one of the "many instances" described in *Parker*, in which a person "of ordinary prudence may prudently take a risk about which he knows, or has been warned about, or that is open and obvious to him. His conduct under those circumstances is a matter which bears upon his own contributory negligence." *Parker*, 565 S.W.2d at 520. Because Section 406.033(a) of the Texas Labor Code takes the employee's own negligence off of the table for a non-subscriber like Kroger, we hold that the district court erred in relying on Austin's subjective knowledge of the spill to grant summary judgment in Kroger's favor.

2.

The district court's second ground for granting summary judgment in Kroger's favor was "that there is no basis to conclude that by failing to have . . . cleaning supplies available to Austin, the store breached its duty to exercise reasonable care." We disagree. Viewing the facts in the light most favorable to

17

Austin, the necessity of Spill Magic to clean this substantial spill is a fact issue best left to the jury. Kroger's own Safety Handbook indicates that "a typical store is supplied with four [Spill Magic Spill Response Stations] placed strategically throughout the sales area of the store for easy access by [Kroger] associates in the event of a spill." According to the Handbook:

> The three main benefits of using the Spill Magic system are:
> 1.   Earlier and more time efficient versus a mop and bucket cleanup[,]
> 2.   25% reduction in slip and fall frequency[, and]
> 3.   A more complete cleanup, without sticky residue or moisture[.]

Thus, the Safety Handbook advises store management to "make certain that the Spill Magic Spill Response Stations are adequately supplied at all times." *Cf. Elwood*, 197 S.W.3d at 794 (holding that there was "no evidence that additional equipment or assistance were needed to perform Elwood's job safely."). Considering Kroger's own emphasis on the benefits of Spill Magic, we conclude that there is a fact issue regarding the product's necessity to clean the spill.[9]

---

[9] This case is distinguishable from *Allsup's Convenience Stores, Inc. v. Warren*, 934 S.W.2d 433, 438 (Tex. App.—Amarillo 1996, writ denied), in which a plaintiff complained that her employer failed to provide her with a back brace. The *Allsup* court emphasized that:

> [The plaintiff] admittedly never requested Allsup to provide a back brace or safety belt for the lifting, nor did she complain of the unloading as unsafe on any occasion. Rather, she testified she had unloaded delivery trucks on other occasions without injury. Neither was there any evidence that a back brace or safety belt was commonly used in, or had been established by industry standards or customs as a safety measure for, unloading merchandise from trucks as was involved in this cause, or that a reasonably prudent employer would have provided such instrumentality. Nor was there any medical evidence that a back brace or safety belt would have prevented the injuries sustained by Warren.

*Id.* Here, by contrast, Kroger expressly advised its employees to use Spill Magic because it reduced the risk of injuries.

3.

The district court's final ground for summary judgment was that there was no genuine issue of material fact regarding Kroger's actual or constructive knowledge of the spill.  Specifically, it stated:

> Austin's sworn testimony affirms that he has no information that any Kroger employee knew, or should have known, that there was liquid on the floor of the men's bathroom.  In addition, Austin admitted in his deposition that he had no evidence to suggest how long the liquid had been on the floor, and was unaware of any customer or employee who had complained about the liquid.  Most importantly, Austin indicated that on the day he fell, he was serving as day utility clerk, and was therefore solely responsible for inspecting the bathroom.

R. 2257–58.

Austin relies on three arguments to rebut the district court's findings on appeal: (1) Austin knew about the spill, and his knowledge is imputed to Kroger per the reasoning in *Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 646 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding that an injured employee's own awareness of a dangerous condition was sufficient to establish the employer's actual knowledge of the same); (2) Kroger employees created the spill, which supports an inference of actual knowledge per *Coffee v. F.W. Woolworth Co.*, 536 S.W.2d 539, 540 (Tex. 1976); and (3) the condition had existed long enough for Kroger employees to discover it upon reasonable inspection, *see, e.g.*, *Burns v. Baylor Health Care Sys.*, 125 S.W.3d 589, 600 (Tex. App.—El Paso 2003, no pet.).  All three arguments are persuasive.

Most importantly, Austin offers specific record citations to support his arguments, which illustrate a fact issue regarding Kroger's knowledge of the spill.  For example, he cites testimony by a Kroger manager that he knew that

the condenser-cleaning process always resulted in liquid leaking onto the floor below. "Proof that a landowner created the dangerous condition may support an inference of knowledge. However, there must be some evidence from which a jury could infer that the landowner not only knew about the condition, but also that it created an unreasonable risk of harm." *Pitts v. Winkler Cnty.*, 351 S.W.3d 564, 574 (Tex. App.—El Paso 2011, no pet.) (citations omitted). Here, at least one manager testified that the leaking liquid was a concern because "you don't want customers slipping and falling." Moreover, Austin offers testimony that Kroger employees are "in and out of the restroom constantly." Viewing this evidence in the light most favorable to Austin, it is sufficient to create a fact issue regarding Kroger's actual or constructive knowledge of the spill.

Because we disagree with all three grounds on which the district court relied, we hold that the district court improperly granted summary judgment on Austin's premises liability claim. We turn next to Austin's ordinary negligence claim.

## B.

Before the district court and on appeal, Austin focused his ordinary negligence claim on two primary theories: (1) negligent activity and (2) failure to provide necessary instrumentalities. We address them in turn.

Austin asserts his first theory, "negligent activity," in the alternative of his premises defect claim.[10] Although negligent activity and premises defect

---

[10] "Negligent activity" is a species of "ordinary negligence." *See Del Lago*, 307 S.W.3d at 778 (Johnson, J., dissenting). It means "simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done." *Id.* (Johnson, J., dissenting) (quoting *Timberwalk Apartments Partners, Inc. v. Cain*, 972 S.W.2d

claims are branches of the same tree, they are conceptually distinct: "negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Del Lago*, 307 S.W.3d at 776 (citation omitted). Thus, the Texas Supreme Court has repeatedly declined to "eliminate all distinction" between these two theories. *See Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992); *see Del Lago*, 307 S.W.3d at 776 (citation omitted). The two claims require different jury instructions, and Texas courts generally treat them as mutually exclusive where the same facts support both claims.[11] In practice, however, distinguishing between these two causes of action can be tricky: "The lines between negligent activity and premises liability are

---

749, 753 (Tex. 1998); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997)). Because a negligent activity claim arises out of an injury sustained on a premises, it often overlaps with a premises defect claim. *See Del Lago*, 307 S.W.3d at 777 ("The trial court was concerned about giving Smith two bites at a negligence verdict in the charge, and we think it correctly noted that under the single [premises defect] question presented, Smith would 'be able to argue exactly what [he has] argued in support of negligent activity.'"). We note, however, that in addition to the elements of ordinary negligence or negligent activity, a premises defect claim requires a showing that the owner possessed actual or constructive knowledge of some condition on the premises that posed an unreasonable risk of harm. *Id.* at 769, 788.

[11] *See Olivo*, 952 S.W.2d at 528–30 (holding that an ordinary negligence instruction is proper when a plaintiff's injuries result from an activity on the premises, but that further instruction on the premises liability elements is necessary if the plaintiff's injury arises out of a condition or defect on the premises); *Keetch*, 845 S.W.2d at 264 (discussing the distinction between the claims and categorizing the plaintiff's claim as *only* one for premises liability); *Ferrell v. McDonald's Corp.*, No. 05-01-00838-CV, 2002 WL 1895346 (Tex. App.—Dallas Aug. 19, 2002, pet. denied) (unpublished but persuasive) (finding that, because the essence of the plaintiff's complaint was not "negligent activity," but rather the presence of toxic chemicals on the premises, the plaintiff's "claim for ordinary negligence [was] subsumed under the premises-liability claim").

sometimes unclear, since almost every artificial condition can be said to have been created by an activity." *Del Lago*, 307 S.W.3d at 776 (citation and internal quotation marks omitted).

Here, we agree with the district court that Austin's "injuries are properly conceived as resulting from a condition on the premises rather than an ongoing activity." As in *Keetch*, Austin slipped on an oily substance on the floor; while he "may have been injured by a condition created by the [condenser unit] spraying," the spraying itself was not the source of his injury. *See Keetch*, 845 S.W.2d at 264. Especially considering that many Texas courts have taken a similar approach,[12] we conclude that Austin cannot pursue *both* a negligent activity and a premises defect theory of recovery based on these facts.

The district court failed to consider whether Austin could pursue an ordinary negligence claim based on his second theory of recovery: that Kroger failed to provide him with a necessary instrumentality in keeping with its duty

---

[12] *See, e.g.*, *Simon*, 2008 WL 2309295, at *2 (upholding dismissal of a plaintiff's ordinary negligence claim, noting that it sounded in premises liability because the plaintiff's allegations focused on "the substance on the floor on which she allegedly slipped"); *see also Reinicke v. Aeroground, Inc.*, 167 S.W.3d 385, 387–88 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (reversing a jury verdict where the plaintiff's allegations were best characterized as a premises liability claim, but the trial court submitted an ordinary negligence charge to the jury); *Price Drilling Co. v. Zertuche*, 147 S.W.3d 483, 488 (Tex. App.—San Antonio 2004, no pet.) (same); *Wal-Mart Stores, Inc. v. Bazan*, 966 S.W.2d 745, 746–47 (Tex. App.—San Antonio 1998, no pet.) (same); *cf. Serrano-Cordero v. Kroger Tex. L.P.*, No. 4:10-CV-483, 2012 WL 3930629, at *4 (E.D. Tex. Aug. 15, 2012), *report and recommendation adopted*, 2012 WL 3930056 (E.D. Tex. Sept. 10, 2012) (dismissing a plaintiff's ordinary negligence claim where the "[p]laintiff himself acknowledge[d] that he slipped on a floor slickened with grease already present in the cooler that mixed in with the cleaning solution he sprayed on the floor," noting that "because this is the focal point of his allegations, [the plaintiff's] claim properly fits under premises law as conceived in Texas"); *but see Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214–15 (Tex. 2008) (rejecting both the plaintiff's negligent activity and his premises condition theories of liability on substantive grounds, without considering whether the two claims were mutually exclusive).

to maintain a safe workplace. Presumably, the district court did not consider this issue because, in resolving Austin's premises liability claim, it decided that "there is no basis to conclude" that Kroger breached its duty to exercise reasonable care by failing to make Spill Magic available to Austin. For the reasons discussed in Section III(A)(2) above, we disagree with the district court's conclusion. Thus, we remand for the district court to consider in the first instance whether Austin's necessary-instrumentalities theory is sufficient to support a stand-alone ordinary negligence claim.

We turn next to Austin's final claim: gross negligence.

## C.

To recover for gross negligence in Texas, a plaintiff must satisfy the elements of an ordinary negligence or premises liability claim *and* demonstrate clear and convincing evidence of "an act or omission involving subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety, or welfare of others." *State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006) (citations omitted). Extreme risk is "is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). The district court rejected Austin's gross negligence claim because, based on the evidence Austin proffered, "no reasonable juror could conclude that Kroger was consciously indifferent to the safety of its employees, or that he faced an extreme risk in performing a job he had done safely for years." Considering the high evidentiary standard that applies to gross negligence claims, we agree and AFFIRM the district court's dismissal of Austin's gross negligence claim.

23

V.

For the reasons stated above, we AFFIRM the district court's judgment with respect to Austin's gross negligence claim and REVERSE and REMAND with respect to his premises liability and ordinary negligence claims.